Good morning, Your Honors. Tom Schlesinger for Steve Pybrum. Welcome back. Yes, you were just here yesterday. I was. The conviction in this case should be vacated for a number of reasons. First, we have to start with the observation that the district court acknowledged that Pybrum had a good faith defense in the case, and he instructed the jury accordingly. This was premised on the fact that Pybrum had applied for and he had received IRS approval to run this charitable foundation. He did that with the assistance of counsel, by the way. Now, as part of the 1023, Form 1023 application for the 501 C3 status, the proposal stated that it would probably take a number of years to get this foundation off the ground. And in the interim, the income that was going to get paid to the officers would be limited. Moreover, it was anticipated that large expenses would be incurred in the early years of the foundation of it, and it would include expenses which the government sought in the case, in the trial, to convert into Pybrum's personal income in order to prove the charged offenses. Now, so the evidence in support of Pybrum's side of the case and the evidence in support of this good faith defense was presented primarily through these documents. And also the testimony of some of the witnesses that were called by the government, including a woman named Teresa who worked in the office after the formation of the foundation, who got the bookings for the television and radio spots, and she also was promoting the book. There was another witness that was called by the government, a Miss Trejo who took phone and Internet orders for shipping the book, making it work together, and Trejo was in charge of shipping books to purchasers. And Pybrum himself was spending his time traveling around the country to try to support this book, which you could find in Barnes & Noble and other bookstores. And then he was in the process of writing the second book, which he wrote in 2002. And so he was making these travel arrangements, he was making these media appearances. All this took up a great deal of Mr. Pybrum's time. Now, Pybrum never attempted to hide any of these gross receipts, the situation you normally find in these kind of cases. And the defense argued in summation that the accounting practice had folded into the foundation and there was some language in the formation papers that supported that. But we can't forget that in approving this particular application for the 501C3 status, the IRS district director basically laid out the ground rules for what Pybrum was supposed to do starting in 1999. And basically it was the director's letter, which is found in the excerpts in 726, which said that if any part of this income that's generated on the part of the foundation is deemed taxable, in other words, it's not related to the charitable purpose of this newly formed foundation, then the taxpayer responsible is going to have to file not an information return under Form 990, but a tax return similar to a corporate S corp tax return under a Form 990T. So... Is this a form letter that was generated or is this a personal ruling that he received in connection with this specific 501C3? It looks like a form letter, but it may have started out as a boilerplate and then it was conformed to deal with the specific purpose of this foundation. And so there is language contained within it which relates specifically to his application. And when you earlier said that it was approved by the IRS, you are relying on this letter and the granting of the 501C3 application? That's right. Okay. Now, if you're looking at this case as an outsider, you might think that the government's got a good case here and that maybe Pybram was trying to pull one over on the IRS. But the evidence created a viable defense and the court agreed that there was a viable defense that... I agree that there was a viable defense, but the standard for insufficiency is whether any rational juror, based on the evidence that was presented, could vote to convict. Right. But we can't even get to that in this case because of the instruction problem that are presented in the briefs. Not only the instructions that the court came up with, but also decisions being made that other explanatory instructions concerning the methods that were used by the IRS auditors and then the criminal investigators working in conjunction with the IRS auditors that were not given, compounded the problem of this instruction that the district court judge formulated, which was called the assignment of income instruction. Because in giving that instruction, Your Honor, basically, you vitiated the jury's ability to deliberate on whether or not Pybram willfully defrauded by subscribing to false returns. And the standard is pretty low based on that controlling Supreme Court case, Cheek v. United States, which dealt with an American Airlines pilot who was attending some seminars by a bunch of freethinkers, a bunch of independent-minded people who didn't think that it was appropriate for the government under the Constitution to make people pay tax for their personal income, but rather income that should be taxed if it's passive. What's the case? Cheek v. United States, 498 U.S. 192. And basically, the Supreme Court said that that airline pilot who failed to report his income for a number of years, he should have been able to have the jury be properly instructed because in that case, the lower court in Cheek had instructed the jury that an honest but unreasonable belief is not a defense to failure to file in attempting to evade payment of taxes. The Supreme Court said, no, that's wrong. In the tax world, actually, a person who acts on a good faith understanding as to the requirements of the law does not act willfully. And then the kicker is even if his understanding of the law is wrong or unreasonable. So in other words, there's this real dichotomy between what the IRS can do against the taxpayer in a civil scenario and what the government can do when they want to criminally prosecute somebody and put them into prison. Weren't they also instructed that he had to, instruction number 19, that the government must prove beyond a reasonable doubt that the defendant knew federal tax law imposed a duty on him and that he intentionally and voluntarily violated that duty and then went on to say what Cheek said, which is a defendant who acts on a good faith misunderstanding as to the requirements of the law does not act willfully, even if his understanding of the law is wrong or unreasonable. So the jury could have found, I think it left open for the jury to find that his understanding of the law, though wrong and unreasonable, was that he could do this as long as he was putting all the numbers between the forms, the 990 and the 1040. He was reporting all the names, just reporting it incorrectly and, you know, obviously assigning it to profits of the corporation or contributions to the corporation as opposed to his personal income. The problem with that, Your Honor, is that even though they got that instruction, they also got an instruction, which was court's instruction number 17, which said that a taxpayer may not avoid the obligation to pay taxes through an assignment of his income. And this is the whole problem with this case is that the court did not define properly, first of all, what a taxpayer is. In the context of that instruction being given, the only taxpayer in question was Mr. Pyram. I mean, taxpayer can be a corporation. Taxpayer can be a foundation. What instruction are you talking about now? This is court's instruction number 17 found at Excerpts 197. That's the problem. And that instruction originates from this 1930 case that Oliver Wendell Holmes decided to use Lucas v. Earl. Let's look at 17. What is it specifically you're complaining about? Complaining about the second to the last full sentence, which says, in other words, comma, a taxpayer may not avoid the obligation to pay taxes through an assignment of his income. The clear import of that instruction was that the income that was in question was these specific items that were put on this government chart, Exhibit 250, which related to the acquisition of the airplane, the acquisition of the boat, the acquisition of the SUV, all these expenses that Pyram, the defense maintained, had a good faith belief he could expense and deduct on the foundational returns and justify it because these things were required in furtherance of building a foundation. And instead, the assignment of income instruction said, no, you can't do that. You earned that money. If you bought things with your earnings, you've got to pay taxes on that. But that was the whole defense. That was what the defense, what Mr. Worksman and Mr. Hathaway were trying to argue before the jury, was that you pulled our whole defense out from under us because you gave this instruction. And Mr. Hathaway was even confused by where the court was going because this was not an instruction that the government had come up with. This was an instruction that the court on its own had come up with and said, you know, I remember when I was a first-year law student. I think we all kind of learned this in Tax 101 that you're not allowed to do this. But Lucas v. Earle had to do with a completely different scenario. It had to do with a husband and wife, and they were filing separately, and they had different marginal tax rates. And so the husband, who was the breadwinner, was trying to assign his income to his wife's return so that they would pay less tax. The tax cases that have now interpreted Lucas v. Earle over time have said, that reasoning, that rationale doesn't necessarily apply in a lot of scenarios. And so the Schuster case and some of the other cases cited in our briefs that talk about that say that it's not a one-size-fits-all type thing where this is just a maxim that can apply in any case. It can't. And so Mr. Hathaway, when he objected to the instruction, wasn't sure whether – well, first of all, he said the instruction failed to define person to include a corporation. And then he said that the instruction ignored the fact that the defendant was promoting the efforts of an educational charitable institution. And then he said he wasn't even sure what exactly the instruction meant. He wasn't sure whether it meant that Pybram could not assign his accounting practice to a corporation and still receive some benefit because he was getting – he was reporting some of the income on his personal return, or whether the specific items listed on Exhibit 250 were items of income which had to be reported – had to be reported on the personal return. And that seems to be kind of what that instruction was saying. And since the instruction was ambiguous in that context, no one can really say for sure how the jury – what the jury did with it. They could have quite easily decided that, well, he couldn't – he wasn't allowed to do that. There's a presumption, a conclusive presumption, that he's not allowed to assign that income to the foundation. He's got to report that income in his 1040 returns. And as a result of that, they took away that element of willfulness. But the charitable foundation is not in the business of preparing tax returns, obviously. That's where a lot of the money at its source was in the preparation of tax returns, according to the record. That's true, but the question is, under Cheek, even if his good-faith belief was unreasonable, objectively unreasonable, he still has a defense and he has to have the ability to argue it. And here, with this assignment of income instruction extant in the record, he's not going to have that opportunity to even argue it to the jury. I mean, I don't know whether – if that assignment of income instruction hadn't been there, then I don't think we'd have a problem. But I think that's really where we have the biggest problem in this case. Let me ask you about the purpose of the foundation was to foster marital happiness? Well, I guess ultimately – I want to know what an airplane had to do with marital happiness. Well, his office was in Bakersfield, but a lot of his clients were all over the Central Valley. So he used that airplane, like most people use a car. To get to his clients, he would more likely fly – These are his CPA clients, right? They were originally – many of these clients were originally CPA – strict CPA clients. But then, with this formation of the foundation, he was going in another direction. He had hired people in the office to work on returns, and he paid people to do that so that he could focus his time and attention on this foundation and in launching this foundation. So, yes, he had clients, and there was a client list involved here, but he had people that worked for him that did that side of the shop, and they got paid for it. What he was doing was he was going out, trying to promote the book, trying to build the foundation, trying to segue from just being a CPA. He had been divorced, and I think maybe part of his motivation was to try to make other people's lives better. Pardon? It could have been in part the divorce because of the airplane. No, the airplane came after the divorce. But what I'm trying to say is that there was some delegation of authority in terms of doing the returns. His focus had changed. He was now involved in other pursuits. Yeah, okay, but you kind of flip between income and deductions. So the use of the plane he wanted to write off as a business expense or a tribute to the foundation as a development expense. That's right. That's a write-off, a deduction. That's right. Then you also said that in response to Judge Dawson's question that, yes, he continued to service his tax preparation plans. He had somebody doing that, yes. Sorry. That's not the fire alarm, is it? It's going away. Okay. So then you threw in that he had hired tax preparers, apparently. Were they hired by him or were they hired by the foundation? Well, you see, there we get into this unreasonable, you know, the cheap thing. Who hired them? Well, he did because he's the main officer of this corporation. So there's no other. He had an unreasonable but good faith belief that his tax practice shifted from him now could fund the foundation, could engage in what was a retail business, basically, of tax preparation. And that was a theory. And what you're saying is Instruction 17 precluded that argument. It did. How did it preclude it? Well, because the whole crux, I guess the corpus delecti or whatever you want to call it, of the offense was what was contained on Exhibit 250, which were this list of things that he claimed could be expensed in the Form 990 return as investments for things bought for the foundation. The judge is basically telling the jury, no, you can't. He generated that from his own income. And as a taxpayer, he can't assign that to the foundation. He's got to pay for that on his personal returns. And so there's no longer the third element that has to be proven to the jury, which is the willful subscription of returns. It's almost like it's not quite strict liability, but it's civil liability. Like in the Lew case that we cited in the reply brief that had to do with the unauthorized copyright issues, where they said, look, if he did it, he's guilty, rather than you have to show that he understood what he was supposed to do and that he specifically intended to violate the law. Do you think his CPA qualifications had a lot to do with the jury's finding? Well, it might have. But then again, in Lew, you had an individual who evidently had been in a situation where the state of the evidence was Lew was aware of the copyright laws and admittedly had been sued for copyright infringement in the past. Same situation, this court going the other way because of the faulty instructions. Mr. Pybram spent his time preparing personal returns, business returns, but there's no indication that he had any level of sophistication when it came to charitable returns. And so there's the distinction there. I see I've got a couple minutes left. I'd like to reserve a little bit of time. Actually, don't, but we'll give you a minute or two afterwards. You're over two minutes. Oh, I'm sorry. Everybody makes that mistake. Thank you very much. Thank you. Good morning, Your Honors. Evan Davis on behalf of the United States. Unless you would like me to start with a particular area, I was going to start with you. I have a problem with some of these enhancements, sentencing enhancements. Certainly. For example, the two-level enhancement for obstructing justice. At the time that he committed these acts, wasn't the guideline that was in effect one that did not apply to civil audits by the IRS? Your Honor, I don't think that's been briefed, so I don't feel like I can answer that question. You don't know the answer to that? I do not know the answer to that. We were using the part of the. So which guidelines do you know this answer? Which guidelines do you apply? Probably Judge Dawson knows this off the top of his head. Do you apply the one that applies to the conduct, the criminal conduct, or do you apply the one that's in effect at the time of the sentencing? It's at the time of the conduct if there's a difference between the two and the difference goes against the defendant. Yes. So that's the case here. I don't know if anybody researched it. I don't think it was brought up in the briefs. I don't believe that it was brought before the district court. So I'm certainly happy to get back to the. I probably was a district court judge back when that's the way it was. So that's why, you know, and that would create an ex-presso facto problem. It would. Is the court saying both? Because I know that the court, the district court focused on one, but the government's position certainly on appeal is that there are two possible bases if you look at the explanations that go behind the enhancement. What's the other section? The first is whether the person concealed evidence material to the investigation. And that goes to whether the defendant was concealing the fact that the invoices, the flight log, and the fact that there were no meeting minutes. What bothered me was that, I mean, clearly the district court judge found that 355.3 factors very much weighed against Mr. Pyram, but the probation office did not think the adjustment for obstruction of justice was appropriate. Yes, and the district court addressed that and basically said, I don't know where the probation officer is coming. I sat through this trial. I might have been looking at the correct guideline. I don't believe so. I mean, I don't have the PSR memorized, but I don't think anyone, including the probation officer, was applying an earlier guideline. The sophisticated means and special skills enhancements. In this case, maybe I'm looking at wrong, but I don't see this as being so highly sophisticated. I mean, other tax fraud cases I've seen have been far more complex than this. I just don't see why this is particularly sophisticated. I mean, I've sat at 501C companies, and I'm not a CPA. I see the special skills, but they're so overlapping. I don't see why it's appropriate to impose both here. Looking first at the sophisticated means, the cases we cited in the brief, including Aragabe, which is a Ninth Circuit case, in essence says that if you go beyond putting false numbers on a tax return, that's the sort of thing that can be sophisticated. So the cases say the run-of-the-mill tax case is putting false numbers on a return. But what the defendant did in the government would argue setting up the foundation, which was a sham from the beginning. It didn't do any work. The book had nothing to do with the foundation. These TV and radio appearances were to promote his tax practice, and his book that was a book that had been written before the foundation started. So the foundation, we would argue, was started with an eye to committing tax fraud. And then that was carried through, including using the bank accounts of the foundation, as well as in filing the false tax returns, and then in essence pretending that the employees were foundation employees, even though they had no idea what the foundation was. It was effectively a stealth charity. Even the employees thought that they worked for an accounting business because they were doing accounting work. It was kind of expected. So the cases that we've cited suggest that although it may not be on the high end of sophisticated, it is certainly sophisticated enough to qualify for the enhancement. I would also note that the defendant didn't really argue below that it didn't apply, so probably the more salient point is whether there's double counting and whether it's fair to impose both the sophisticated means and special skill. And as the Court found in the cases that we cited, as long as they go to, in essence, different harms or different skills versus actions, then it can be appropriate. Obviously this is the sort of thing that a court has to decide on. How are they separate? How are they different here? The special skill was his being a CPA, and although defense counsel says that he had no experience with nonprofits, in fact, he did say, and this is not in the trial record, but it was in a motion filed pretrial, he did say to Agent Wing, hey, plenty of nonprofits prepare tax returns. So it at least suggests that he knows that there are rules about nonprofits and tax returns. But in any event, the fact of his being a CPA and knowing about, you point out that you're a lawyer, you set up a 501c3, a lawyer would actually could qualify for a special skill as well. Certainly there are individuals. You don't have to be a CPA or a lawyer to set up a charitable foundation. The case law suggests that if it makes it easier to do it, then it is appropriate to impose the special skill. So it looks at the person instead of the conduct, and the person is someone who used the special skill being a CPA, his knowledge of the tax law to perpetuate this, to start the scheme and to perpetuate the scheme. He was also smart enough to put down the money that was being earned for preparing tax returns by Piberman Company as a contribution, instead of putting it down as something that was taxable. He could have put it down on the 990 as taxable receipts of the foundation. It would have been taxed at a corporate level, and then that issue would have been off the table in terms of the falsities of his return. So the way that he filled out the forms, the fact that he set up the foundation suggests that the special skill of his knowledge of taxes aided the scheme, and that's why the court imposed it. Was instruction number 17 necessary? Yes. Why? Instruction number 17 is basically two instructions in one. The first line of the instruction is effectively a quote from schedule the schedule C instructions, and that says that if a person is operating their business as a sole proprietor, they have to report their gross receipts on their schedule C. It doesn't presuppose that the defendant was operating as a sole proprietor. It could have been the Foundation for Harmony and Happiness running an accounting business, even though that's, of course, inconsistent with their charitable purpose. So that line instructed the jury, if the defendant earned it as a sole proprietor, he has to report it on his schedule C, precisely because of the confusion that has particularly seen in the appellate briefs here that has ensued. It was important to instruct the jury. And, of course, they had the schedule C instructions anyway in the evidence, but this just highlighted that for them. The second half of the instruction, so that went to the gross receipts on the schedule C. The second half of the instruction talks about income and unreported income. And precisely so the jury would not be confused about if the defendant used business bank accounts to pay his rent, squirrel away money for his retirement, pay for dating services and other personal expenses, and then buy a fishing boat, an airplane and a car for him without actually giving him the money first, then it's taxable to him. If it's income to him, if it's for his benefit, it is income to him. So it would prevent juror confusion. What you have is Instruction 17, the first sentence, saying if he earned it as a sole proprietor, go to the schedule C. You have Instruction 18 saying if the foundation earned it for whatever reason, taxable or not, it shows up on a 990 or 990-T. So it was basically the other side of the coin of Instruction 18, that first line and the second line went to the total income. Yes, Your Honor. Now, he's singled out, the counsel has singled out the in other words language. Is that part of the second or part of the first? Well, it's part of the second, and I recognize that language. I will tell you that in terms of if there's concern about confusion, if you look at how the attorneys argued it, it was that portion was argued in the government's closing precisely as you can't deflect your income and then claim it's not yours. You have to, if it is for your benefit, you have to report it. Right. But it's the language, in other words, taxpayer may not avoid the obligation to pay taxes on assignment of his income. That isn't in other words. It's not saying. I recognize. I do recognize that, that it is not as clear. Well, it's modifying the first sentence. Yeah, it's suggesting that there was an assignment of income here. Well, how does. The jury can still find. Well, the jury can still. I'm not sure I understand the court's, how the court gets to that being an assumption that money was assigned. Well, because it's the first time that an assignment of his income is used, right? Suggesting that there was an assignment of income here. Or that the jury could still find. The jury could find, again, as I indicated, the government argued that the jury could find that the assignment of his income occurred when, even his defense counsel was saying in his oral argument, when the business accounts were used to pay for his personal expenses. So in a way, it's a non sequitur. I recognize that. And putting the, in other words, in the middle does not help. That's what I was asking was, was it necessary to put this in and could it create more jury confusion? If, since the, since C, the instructions for Schedule C were already in, in theory, you didn't need the first line because the government could have just said you have this in evidence. To avoid an argument, it really is to, I recognize the court's concern, but it is not an uncommon argument for defense counsel to make, or even more of a concern for a jury to wonder, well, he never touched the money. So does that mean that it's income to him? And that was the point that was being made. So, again, I recognize that because of the, in other words, language, it is not perhaps as clear as it could have been. And the way that it was argued suggests that there could not have been confusion here, because we didn't argue that that was modifying the first sentence. We talked about gross receipts. If he earned them, they have to be on his Schedule C. And then let's talk about all the money that was used to purchase, to finance his lifestyle, what defense counsel called a Spartan lifestyle. But an airplane, a fishing boat, and a brand-new SUV don't really sound like what most people would call a Spartan existence. So that's what we were focusing on with the second line, or the second part of the instruction. Kennedy. How does the second part of the instruction relate to the use of the airplane? It relates to the purchase of the airplane. So the question, the jury was given evidence of three major assets that were purchased, the government argued, for the defendant's benefit, and therefore would be income to him. In addition, there were six or seven categories. Rent, which was up to $24,000 a year. I think it was the last three years it was over $20,000 a year. And other, the dating service, et cetera. And the jury was basically told that the government's theory is that all of these things were income to the defendant. They should have been reported in his total income. He only reported $25,000 to $30,000 a year, though that number was false for any one of a number of reasons. So income was defined in such a way to include the beneficial, like in-kind income. Exactly, because the defendant effectively didn't have his own bank account. He was using initially Piberman Company, including in 1999, one of the years it issues, to pay all of his personal expenses. And then in 2000, 2001, and 2002, he started just paying all of his personal expenses out of the Foundation for Harmony and Happiness bank account. So that was the focus for the total income. And so we argued, look at how the, do you think that the airplane was for business or Foundation use on one side or personal use? There were four people who testified about how the defendant used the airplane. Three of them were ex-girlfriends. They totaled, I counted, 24 to 25 trips. All of them were personal. Kennedy. So it was imputed income. Waxman. Exactly. Kennedy. All right. So was there an instruction on imputed income? Waxman. That's effectively the second half of 17. And was what you just stated here, is that the nature of the argument? Yes. Government made to the jury. Yes. And was the term imputed income used? I don't know if the word imputed, but we said. The concept. The concept, yes. I want to ask you about the motion to supplement the record on appeal. Yes, Your Honor. We do not take evidence on appeal as an ordinary matter. And I don't accept at face value that you were trying to submit this so that we wouldn't be under the mistaken impression that trial counsel was ineffective by failing to raise a timeliness challenge. Why I do want us to consider the tolling agreements. To the extent the court, of course, the defense raised an argument, as the court's aware, in their appeal brief, stating that the government did not timely indict the defendant because six years had elapsed between the time of the filing and the time of the indictment. Defense counsel did not cite, of course, the fairly clear case law or maybe entirely clear case law, saying that if you don't raise it before the district court, you're out of luck. However, to the extent that the court was going to look at the merits, the defense counsel was aware of, and because the defendant signed and defense counsel had copies of, the seven statute of limitations tolling agreements that pushed the deadline well beyond the date of indictment. So we wanted the court, to the extent the court is going to consider the argument that the defendant made, we wanted the court to have as part of the record something that we never would have put into the district court because the defendant was never arguing that the indictment was untimely. I'm happy to go into any other areas if the court has any additional concerns or questions, but if not, I will submit. Thank you, Your Honor. Thank you. We'll give you a couple more minutes, two more minutes. Your Honor, there's actually two elephants in the room in this case. One of them hasn't even been discussed yet. The first elephant is the assignment of income problem, and I don't think that's been resolved yet. The second one is the issue of bias and the fact that the only government witness who ever had any contact with Mr. Pybram and interviewed Mr. Pybram was the civil auditor Wing, and Wing had overinflated his estimation of what he thought the tax liability was for Mr. Pybram in support of the criminal referral to IRS CID. He had also had these rather contentious meetings with Mr. Pybram and claimed Mr. Pybram was a pretty arrogant guy, a contemnatious guy who was completely uncooperative, and he tried to paint a picture of a guy. He denigrated him. He tried to paint a picture before the jury of somebody who really wasn't worthy of much consideration because of the way he dealt with the IRS, and yet every time the defense tried to bring up these issues of bias on the part of Agent Wing, they were defeated by the court. The court said that he thought there was some relevance to it, but it didn't overcome a balancing. Van Arsdale and the case of, I think it's Schoenberg in this court, I believe perhaps one of the panel members was on that case, said that under Davis v. Alaska, the limitation cannot preclude a defendant from asking not only whether a witness was biased, but also to make a record from which to argue why the witness might be biased. There was no opportunity to present anything to the jury that they might want to question the testimony of the only witness who had any contact with Mr. Pybram, who was the pivotal witness in convincing the jury that Pybram acted willfully in subscribing to false returns because of the answers that he gave, because he was evasive, because he wasn't cooperative. Even though the agent never conferred with the attorney, Mr. Pybram said, talk to my attorney. You want records? Talk to my attorney. Didn't go to the attorney. So there were a lot of shortcomings in the way the auditor handled those two interviews, but the bias was there. The overinflated, the $1.2 million in tax liability went at the time of sentencing. It's too late for Pybram now. He's already been convicted. The judge determines it's about $42,000. That wouldn't have even justified under the policy guidelines of the Department of Justice a criminal referral to the Los Angeles office. $1.2 million would, and that's what Wing had documented in these reports to get CID interested and then from CID to get this gentleman and his folks interested in bringing this indictment federally. So there's a problem right there, is that that impeachment evidence was precluded, and that all dovetails into this problem with the assignment of income and with the failure to give a bank deposits method instruction, which is in the book that talks about indirect methods of determining gross income. The biggest failure of Exhibit 250 was the fact that the boat, the plane, the SUV, these other expenses, the veterinary, whatever it was, that they didn't consider the fact that some of this stuff might be deductible under the law. The bank deposits method, the instruction, which is found at 67 colon 07 of the instructions for federal criminal cases, describes in the same manner it describes other indirect methods of gathering evidence, how it's done, how it's supposed to be done. When you talk about assignment of income and you say all of this income should have been assigned to Mr. Pyron's personal returns, you ignore the fact that a lot of these investments were deductible by the foundation, could have been deductible or justifiably deductible by the foundation. The boat, it's a red herring. The guy who sold the boat to Mr. Pyron testified in trial. Somebody asked him, he said, could you do business on that boat? And he said, yeah, you and I could do business on that boat. And there were questions about the airplane. Mr. Pyron was using the airplane to travel all over the Pacific Southwest to promote the book, the foundation, all of this. Was he really promoting it or was he taking those trips with his dates? Were they along? There was some interesting testimony about that, Your Honor, and there were times when he would take one of the ladies with him when he was doing, when he was on circuit, when he was going around doing his thing. And they testified, well, you know, we check into the hotel. We land, we check into the hotel. I don't know what, I go do my nails or I go shopping. I don't know what he's doing. That's the problem here. When Pyron's in that rented room in Montecito, Pyron's a workaholic. His whole life is wrapped up in this effort to promote the foundation. He can write that off as an office expense the same way I can write off my own office in the back of my house as a sole practitioner. Nothing wrong with that. All of that stuff could have been explained in a bank deposits method instruction that should have been given by the court in this case because bank deposits method was used as part of the investigation. All right, counsel. You're well over your time, so thank you very much. And United States v. Pyron will be submitted.
judges: Dawson, Wardlaw, Fisher